UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD L. PATRICK, | : | CIVIL NO: 1:15-CV-00108 |
| Plaintiff | : | (Judge Kane) |
| v. | : | (Chief Magistrate Judge Schwab) |
| WERNER ENTERPRISES, | : | |
| Defendant | : | |

# REPORT AND RECOMMENDATION

## I. Introduction.

The plaintiff, Leonard L. Patrick, brings claims of sexual harassment and retaliation under Title VII against the defendant, Werner Enterprises ("Werner"). Because the undisputed facts show that Werner was not Patrick's employer, we recommend that the Court grant Werner's motion for summary judgment. In addition, even assuming that Werner was Patrick's employer, Werner is entitled to summary judgment because given the undisputed facts, a reasonable trier of fact could not conclude that Werner subjected Patrick to a sexually hostile work environment or retaliated against him after he complained that he was subject to a sexually hostile environment.

## II. Background and Procedural History.

Patrick began this action in January of 2015. Although Patrick was *pro se* when he began this action, counsel subsequently entered an appearance on behalf of Patrick and filed an amended complaint in March of 2016. The amended complaint contains two Title VII claims against Werner. The first is a sexual harassment claim based on conduct allegedly perpetrated upon Patrick by David Tompkins. More specifically, Patrick alleges that Tompkins told him that his lisp made him sound gay, showed him photos on his cell phone of nude women, and sexually assaulted him. The second is a claim that Werner retaliated against him after he reported the conduct by Tompkins. More specifically, Patrick alleges that after he reported Tompkins's actions, he began receiving lower paying, less desirable job assignments and he was subsequently terminated. Werner filed an answer to the amended complaint, and the parties engaged in discovery.

The Court subsequently granted Patrick's counsel leave to withdraw from the action after he accepted employment with the Commonwealth. Discovery continued with Patrick proceeding *pro se*. The undersigned held several telephone discovery conferences with the parties.

On March 24, 2017, Patrick filed a number of exhibits consisting of documents from MassMutual Financial Group regarding "Werner Enterprises, Inc. and Subsidiaries Employees' 401(k) Retirement Savings Plan" and documents

regarding Patrick's application of unemployment compensation benefits as well as other benefits from the Pennsylvania Department of Public Welfare. *See Docs. 78 & 79*. Because there was no motion pending at the time, the parties were in the discovery process, and it was not the time for the parties to be filing evidence with the court, by Order dated March 27, 2017, we ordered those documents stricken from the record.

On July 26, 2017, Patrick filed a "Memorandum" and exhibits consisting of various photographs, a stick-figure drawing of an assault, more unemployment compensation documents, phone bills and call logs, excerpts from legal treatises, a Werner ID card, Werner's response to Patrick's EEOC complaint, and a written warning issued to Patrick. *See Doc. 90*. Again, at the time Patrick filed those documents, no motion was pending. Thus, by an Order dated August 7, 2017, we ordered them stricken from the record. We noted that Patrick may file a memorandum and exhibits at the appropriate time, which would be either in opposition to a motion filed by Werner or in support of a motion filed by Patrick.

On August 9, 2017, Patrick filed a motion for reconsideration of the Order of August 7th striking his memorandum. But concluding that he did not present a cogent reason for the Court to reconsider the Order of August 7th, we denied that motion.

Also on August 9, 2017, Werner filed a motion for summary judgment, a brief in support, a statement of material facts, and supporting documents. We ordered Patrick to file, on or before September 5, 2017, a brief in opposition to Werner's motion, a response to Werner's statement of material facts, and any transcripts, affidavits, or other relevant documentation in accordance with Local Rules 7.6 and 56.1. We noted that unlike the previous memorandum that Patrick filed, his brief in opposition to the motion for summary judgment shall, at a minimum, respond to the arguments raised in Werner's brief in support. Further, we highlighted for Patrick that in accordance with Local Rule 56.1, his response to Werner's statement of material facts must respond to the numbered paragraphs set forth in Werner's statement of material facts, and he must cite to record evidence supporting any denial of Werner's statements of material fact. We also warned Patrick that if he fails to deny a material fact set forth in Werner's statement of material fact, that fact shall be deemed admitted. Likewise, we warned Patrick that if he fails to cite to record evidence to support a denial of a material fact set forth in Werner's statement of material facts, that fact shall be deemed admitted.

Patrick has not filed a brief in opposition to Werner's motion for summary judgment as ordered. Nor has he filed a response to Werner's statement of material facts. Based on the undisputed facts, Werner is entitled to summary judgment.

## III. Summary Judgment Standards.

Werner moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

      The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-

moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the

motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

**IV. The Material Facts.**

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the moving party means that those facts are deemed admitted. Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

Here, because Patrick has not responded to Werner's statement of material facts, the following material facts set forth by Werner are deemed admitted.

Patrick is an adult individual who resides in Wilkes-Barre, Luzerne County, Pennsylvania. *Doc. 96* ¶ 1.  Drivers Management, LLC ("DM") is a wholly owned subsidiary of Gra-Gar, LLC, which is a wholly owned subsidiary of Werner. *Id.* ¶ 2.  DM employed Patrick on three separate occasions. *Id.* ¶ 3.  It first hired him on or about April 3, 2013. *Id.* ¶ 4.  DM was Patrick's employer at all times. *Id.* ¶ 5.  Patrick received his paychecks from DM. *Id.* ¶ 6.  Patrick never worked for Werner. *Id.* ¶ 7.

When DM hired him, Patrick signed a written acknowledgement that he received the following documents: (1) Federal Motor Carrier Safety Regulations Handbook; (2) Pocket Guide to Hazardous Materials; (3) Driver's Handbook; and (4) Record of Substance Abuse Education and Training. *Id.* ¶ 8.  DM has a policy regarding unlawful discrimination, harassment, and retaliation that delineates what employees should do if they feel that they were subject to discrimination, harassment, and/or retaliation. *Id.* ¶¶ 9–10.

Patrick trained with co-worker David Tompkins for as few as four days to as many as sixteen days. *Id.* ¶ 11.  Tompkins was a qualified driver. *Id.* ¶ 12.  He was not Patrick's supervisor; nor was he part of DM's management team. *Id.* ¶ 13.  Patrick alleges that Tompkins assaulted him on June 1, 2013. *Id.* ¶ 14.  On June 1,

2013, at approximately 3:30 a.m., Tompkins called the safety hotline and reported to Cory Morris that Patrick left the truck. *Id.* ¶ 15.  In a Complaint and Incident Report ("CIR"), Tompkins stated that he had stopped because he had used the restroom at a fuel stop and the toilet had overflowed onto his pants. *Id.* ¶ 16.  Tompkins stated that he washed his pants and took a shower at the truck stop in Harrisburg, Pennsylvania. *Id.* ¶ 17.  In the CIR, Tompkins further stated that Patrick wanted to get off the truck as soon as possible, and when Tompkins returned to the truck, Patrick became angry. *Id.* ¶ 18.  Tompkins reported that when he attempted to lie down on the bunk where Patrick was sitting, Patrick got upset and left the truck. *Id.*

After speaking with Tompkins, Morris then contacted Patrick to assess the situation. *Id.* ¶ 19.  When speaking with Morris, Patrick admitted that he was angry about the stop in Harrisburg, and he claimed that Tompkins should have waited to wash his clothes until they reached the Allentown terminal. *Id.* ¶ 20.  Patrick refused to get back in the truck with Tompkins. *Id.* ¶ 21.  Morris offered to get Patrick a room at the nearby Holiday Inn Express, and she sent Patrick a bus ticket to allow him to get from Harrisburg to Allentown. *Id.* ¶¶ 22–23.  At no time during his call with Morris did Patrick allege that he had been sexually assaulted. *Id.* ¶ 24.

On or about June 5, 2013, Patrick completed a "Trainee's Evaluation of Trainer" ("Evaluation") and alleged for the first time that Tompkins "sexually

assaulted" him. *Id.* ¶ 25. In support of his allegations, Patrick provided a written statement that included the following declaration: "He asked me to move from the bunk. . . . I didn't and he started taking his shoes off and that's when he attacked me." *Id.* ¶ 26. Nowhere in the Evaluation, which Patrick signed and completed approximately three or four days after the alleged incident, did Patrick state that Tompkins was naked or that he was without clothes or attire. *Id.* ¶¶ 27–28.

Upon receipt of the Evaluation, DM promptly instituted an investigation. *Id.* ¶ 29. On June 6, 2013, Safety Specialist Kathy Acevdeo, Student Driver Safety Specialist Dixie Norris, and Human Resources Employee Relations Specialist Susan Martin held a conference call with Patrick. *Id.* ¶ 30. During this conference call, Acevedo, Norris, and Martin discussed Patrick's Evaluation, and they asked Patrick to write an additional statement to clarify comments on the Evaluation. *Id.* ¶¶ 31–32. Also during this conference call, Patrick stated that Tompkins had his clothes on but that his shoes may have been off. *Id.* ¶ 33. At the end of the conference call, Acevedo, Norris, and Martin told Patrick (1) that they appreciated his time; (2) that the investigation was confidential; (3) that he should not speak with anyone else about the investigation; (4) that he should not have any further contact with Tompkins; and (5) that he should call them if anything else occurred. *Id.* ¶ 34.

On June 12, 2013, Martin, Norris, and Lead Safety Specialist Bo Willis held a conference call with Tompkins to discuss Patrick's allegations. *Id*. ¶ 35.  During the conference call, Tompkins denied Patrick's allegations. *Id*. ¶ 36.  Tompkins stated that when he returned to the truck, he asked Patrick if he could lie down in the bottom bunk, and Patrick refused. *Id*. ¶ 37.  During the training, there were several instances where Patrick and Tompkins each slept in the bunks in the cab at the same time. *Id*. ¶ 38.  After Patrick refused, Tompkins went to lie down on the back of the bottom bunk. *Id*. ¶ 39.  Tompkins stated that Patrick started pushing Tompkins with his back and Tompkins pushed back. *Id*. ¶ 40.  Tompkins further stated that Patrick became furious and called safety and got off the truck. *Id*. ¶ 41.  Martin counseled Tompkins about getting in a bunk with a student, and she instructed Tompkins not to have any further contact with Patrick. *Id*. ¶ 42.  On June 12, 2013, Martin contacted Patrick to tell him that his complaint had been addressed, and she told Patrick not to discuss the matter with others and to have no further contact with Tompkins. *Id*. ¶ 43.

After the alleged incident between Patrick and Tompkins, Patrick never worked or had any contact with Tompkins again, and he never had any further complaints regarding Tompkins. *Id*. ¶ 44.  After Patrick reported the alleged incident with Tompkins, he successfully completed his training, and DM offered him a job as a qualified driver. *Id*. ¶ 45.  Specifically, in June of 2013, Patrick was

12

offered an assignment called "48 States over the Road," and he was provided his own truck. *Id.* ¶ 46.

In July of 2013, Patrick was offered a position as one of the dedicated drivers on an account called the Americold or ConAgra account ("ConAgra account"). *Id.* ¶ 47. The ConAgra account was assigned to Patrick after he reported the alleged incident with Tompkins. *Id.* ¶ 48. Patrick was one of several drivers on the ConAgra account. *Id.* ¶ 51. While on the ConAgra account, Patrick had two late loads—one on August 13, 2013, and another on August 19, 2013. *Id.* ¶ 52. In August of 2013, the number of drivers needed for the ConAgra account decreased, and Patrick was removed from the ConAgra account because the number of drivers needed for the account decreased, Patrick was one of the least senior drivers assigned to the account, and he had been reprimanded twice for being late with his deliveries. *Id.* ¶¶ 53–54. Peter Mullenberg, who was the Associate Director of the ConAgra account at the time, made the decision to remove Patrick from the ConAgra account. *Id.* ¶¶ 55–56. When Mullenberg made the decision to remove Patrick from the ConAgra account, he did not know about the alleged incident between Patrick and Tompkins or that Patrick had made a complaint against Tompkins. *Id.* ¶ 57.

After Patrick was removed from the ConAgra account, he was given the "48 States over the Road" assignment. *Id.* ¶ 58. Patrick testified that the "48 States

over the Road" assignment was not less preferable to the ConAgra account; it was equally desirable to the ConAgra account. *Id*. ¶¶ 49–50.

Patrick's first stint of employment with DM ended in August of 2013, when he voluntarily quit. *Id*. ¶ 59. After leaving his employment with DM in August of 2013, Patrick filed for benefits with the Commonwealth of Pennsylvania, Department of Labor and Industry, Office of Unemployment Compensation Benefits ("UC Office"). *Id*. ¶ 60. A Notice of Determination dated September 10, 2013, from the UC Office found that Patrick's last day of employment was August 20, 2013, and that Patrick had voluntarily quit. *Id*. ¶ 61–62. In the Claimant Questionnaire completed by Patrick, he checked the box for "quit." *Id*. ¶ 63. On or about October 11, 2013, Referee S.G. Hess ("Referee Hess") of the Commonwealth of Pennsylvania, Department of Labor and Industry, Unemployment Compensation Board of Review issued an Order denying Patrick's request for unemployment compensation benefits. *Id*. ¶ 64. Referee Hess found that, on August 22, 2013, Patrick was told that because cargo had slowed down he would have to return to the job over the road. *Id*. ¶ 65. Referee Hess also found that Patrick voluntarily quit his employment. *Id*. ¶ 66.

On October 9, 2013, Patrick filed a complaint against Werner with the EEOC. *Id*. ¶ 67. On or about October 30, 2013, Patrick reapplied to and was rehired by DM. *Id*. ¶ 68. Patrick indicated on his Application for

Employment/Drivers Management, dated October 30, 2013, that he had left his previous employment with DM for "personal reasons." *Id*. ¶ 69.

In his second stint of employment with DM, Patrick worked for DM from October of 2013, to February of 2014, when he voluntarily quit his employment with DM for a second time. *Id*. ¶ 70. After he left in February of 2014, Patrick applied and was rehired by DM in or about May of 2014. *Id*. ¶ 71. In his third stint of employment with DM, Patrick worked for DM from May of 2014, to September of 2014, when he voluntarily quit his employment for a third time. *Id*. ¶ 72. In sum, DM hired Patrick on three different occasions, including two occasions after Patrick had reported the alleged incident with Tompkins and after he had filed his EEOC complaint. *Id*. ¶ 73.

On or about November 6, 2014, Patrick completed a driver application for US Xpress, Inc. in which he stated that the reason for leaving his position with DM in August of 2013 was "voluntary quit/issues with pay." *Id*. ¶¶ 74–76. After leaving DM in August of 2013, Patrick worked as a driver for Western Express from September of 2013 to October of 2013, until he voluntarily quit. *Id*. ¶ 77. After leaving Western Express, Patrick worked as a driver for DM from October of 2013 to February of 2014, until, as set forth above, he voluntarily quit. *Id*. ¶ 78. After leaving DM in February of 2014, Patrick worked as a driver for J.P. Donmoyer from February of 2014, until May of 2014, when he was discharged. *Id*.

¶ 79. After leaving J.P. Donmoyer in May of 2014, Patrick worked as a driver for DM from May of 2014, to September of 2014, when, as set forth above, he voluntarily quit. *Id.* ¶ 80.  After leaving DM in September of 2014, Patrick worked as a driver for US Xpress from October of 2014, to November of 2014, when he voluntarily quit. *Id.* ¶ 81.  After leaving US Xpress in November of 2014, Patrick worked as a driver for Edwards Distribution Services from January of 2015, to February of 2015, when he was terminated. *Id.* ¶ 82.  After leaving Edward Distribution Services in February of 2015, Patrick worked as a driver for Bolus Freight Services, Inc. from May of 2015, to March of 2016, when he voluntarily quit. *Id.* ¶ 83.  In sum, from April of 2013, to March of 2016, Patrick worked for six different employers. *Id.* ¶ 84.

In his original complaint, Patrick referenced the following specific incidents with Tompkins in support of his sexual harassment claim: (1) the alleged incident in the bunk on June 1, 2013; (2) an alleged comment from Tompkins about Patrick's lisp; and (3) Tompkins allegedly showing Patrick pictures of nude women on his phone. *Id.* ¶ 86.  He referenced the same incidents in support of his sexual harassment claim in his amended complaint, in his answers to Werner's First Set of Interrogatories, and in his charge of discrimination with the EEOC. *Id.* ¶¶ 85, 87–88.

## V. Discussion.

Werner contends it is entitled to summary judgment because it was not Patrick's employer. Instead, according to Werner, Patrick was employed by DM, and although DM is a wholly owned subsidiary of Gra-Gar, LLC, which is a wholly owned subsidiary of Werner, that is not enough to hold Werner liable.

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting William O. Douglas & Carrol M. Shanks, *Insulation from Liability through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929)). "Thus it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary." *Id*. at 61–62 (quoting Douglas, 39 Yale L.J. at 196). "But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *Id*. at 62. Generally, "[i]n the employment discrimination context, a parent corporation will be held responsible as an employer only where it

17

and the subsidiary are "'so interrelated and integrated in their activities, labor relations and management" that we should pierce the corporate veil.'" *Wellman v. Dupont Dow Elastomers L.L.C.*, 414 F. App'x 386, 389 (3d Cir. 2011) (quoting *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 514 (3d Cir. 1996)).

Also, "a company and its affiliates" may be considered "a single employer under Title VII (1) when a company has split itself into entities with less than fifteen employees intending to evade Title VII's reach; or (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining" or (3) when after an "open-ended, equitable inquiry," it is found that the "entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 85–87 (3d Cir. 2003). Under this third prong, the inquiry often focuses "on the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." *Id.* at 87. "Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.,* hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business

exclusively with the other." *Id*. The financial entanglement of the companies may also be relevant. *Id*. at 88.

Here, the fifteen-employee requirement is not at issue, and based on the undisputed facts, there is no basis for a reasonable trier of fact to conclude that Werner directed DM to perform the allegedly discriminatory acts in question, that Werner was not a separate and distinct entity from DM, or that there is any ground to pierce the corporate veil. Accordingly, Werner is entitled to summary judgment.

Werner also presents numerous reasons why it should be granted summary judgment on the merits of Patrick's claims. Even assuming that Werner was Patrick's employer, Werner is entitled to summary judgment because based on the undisputed facts, a reasonable trier of fact could not conclude that Werner subjected Patrick to a sexually hostile work environment or retaliated against him after he complained about Tompkins's alleged actions.

## VI. Recommendation.

Based on the foregoing, we recommend that the Court grant Werner's motion (doc. 95) for summary judgment.

> The Parties are further placed on notice that pursuant to Local Rule 72.3:
>
> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the

disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 11th day of December, 2017.

*S/Susan E. Schwab*
Susan E. Schwab
Chief United States Magistrate Judge